**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF NORTH CAROLINA**
**SOUTHERN DIVISION**

| | |
|---|---|
| LEON CAPITAL GROUP, LLC; LG ACQUISITIONS, LLC; LG CARY ATC LAND, LLC; and LG JOHN BARRY DRIVE, LLC; <br><br>       Plaintiffs, <br><br> v. <br><br> SCHWARZ BETEILIGUNGS-GMBH d/b/a SCHWARZ GRUPPE; LIDL STIFTUNG & CO. KG; LIDL US, LLC; LIDL US OPERATIONS, LLC; and LIDL US MANAGEMENT, LLC; <br><br>       Defendants. | Civil Action No.: 4:18-CV-105 |

## <u>COMPLAINT</u>

Plaintiffs Leon Capital Group, LLC ("Leon Capital"), LG Acquisitions, LLC ("LG Acquisitions"), LG Cary ATC Land, LLC ("LG Cary"), and LG John Barry Drive, LLC ("LG Wilmington") (collectively, "Leon" or "Plaintiffs"), complaining of Defendants Schwarz Beteiligungs GmbH d/b/a Schwarz Gruppe ("Schwarz Group"), Lidl Stiftung & Co. KG ("Lidl Stiftung"), Lidl US, LLC ("Lidl US"), Lidl US Operations, LLC ("Lidl US Ops"), and Lidl US Management, Inc. ("Lidl Management") (collectively "Lidl" or "Defendants"), hereby allege and state as follows:

## NATURE OF ACTION

This action arises from Lidl's fraudulent and deceptive conduct and its intentional and wrongful termination of certain agreements, contracts, and promises with Leon regarding three real estate development projects in North Carolina located in Cary, Wilmington, and Charlotte. Lidl agreed to construct and operate a Lidl grocery store to anchor each of the developments; however, Lidl abruptly terminated its agreements to purchase the real estate parcels from Leon and reneged on its obligations to construct and operate the stores and repudiated its promises related to the same. Despite due demand, Lidl refuses to meet its obligations to Leon and other third parties and seeks to wrongfully leave Leon with substantial financial losses related to the developments.

These developments were part of Lidl's larger plan for its entry and rapid expansion into the lucrative United States grocery market – a market sector forecast to be worth $1.7 trillion by 2022[1]. Lidl, having dominated the European discount retail grocery market, set its sights on entering the US market and gambled that its European model would also dominate here. In early 2016, Lidl publicly announced that it would build hundreds of stores in the eastern US by 2018/2019 – an overly aggressive expansion plan for a new entrant into the market.

Such an ambitious market entry and expansion plan was destined for failure: to date, Lidl has only opened around fifty stores out of the hundreds it had on the drawing board. After such a disappointing launch, Lidl has taken a hatchet to its plans and dramatically scaled back its expansion. In the wake of this abrupt about-face, Lidl has left real estate developers like Leon holding the proverbial bag on millions in development costs, which costs were fraudulently induced by Lidl through a continued systematic series of lies, misrepresentations, and bad faith.

---

[1] Source: Institute of Grocery Distribution (IGD) Datacentre

In this case, time and again, Plaintiffs, affiliates of Texas based Leon Capital Group, detrimentally relied on Lidl's false promises and invested substantial resources and dollars on major developments on behalf of Lidl - investments for which Lidl deceptively vouched and promised to pay. All the while, Lidl knew that it would not complete its US expansion plan as it was represented to Leon and others and Lidl knew, well prior to advising Leon otherwise, that it would never construct and operate the Lidl stores in the subject developments as agreed.

Lidl's malfeasance and deceptive pattern of conduct, detailed herein, pervaded its US expansion plan and operations and left local property owners, contractors, subcontractors, architects, engineers, and developers – including the Plaintiffs – as victims of Lidl's fraud, deception, and bad faith.

## PARTIES

1. Leon Capital is a Texas limited liability company, which is registered and authorized to do business in North Carolina and which maintains an office in North Carolina.

2. LG Acquisitions is a Texas limited liability company, which is an affiliate of Leon Capital.

3. LG Cary is a Texas limited liability company, which is an affiliate of Leon Capital.

4. LG Wilmington is a Texas limited liability company which is an affiliate of Leon Capital.

5. Upon information and belief, Schwarz Group is a German limited company (Gesellschaft mit beschränkter Haftung or GmbH) organized and existing under the laws of the Federal Republic of Germany and having an address at Rötelstraße 30 Neckarsulm, 74172, Germany.

6.	Upon information and belief, Lidl Stiftung is a German limited partnership (Kommanditgesellschaft or KG) organized and existing under the laws of the Federal Republic of Germany and having an address at Stiftsbergstraße 1 Neckarsulm, 74167, Germany.

7.	Upon information and belief, Lidl Stiftung is a wholly-owned and operated subsidiary of Schwarz Group.

8.	Upon information and belief, Lidl Stiftung owns and operates the Lidl brand supermarket chain, based in Neckarsulm, Germany, which has over 10,000 stores globally.

9.	Upon information and belief, Defendant Lidl US is a Delaware limited liability company, which has a business address and headquarters at 3500 South Clark Street, Arlington, Virginia, 22202.

10.	Upon information and belief, Defendant Lidl US Ops is a Delaware limited liability company, which has a business address and headquarters at 3500 South Clark Street, Arlington, Virginia, 22202.

11.	Upon information and belief, Defendant Lidl Management is a Delaware corporation, which has a business address and headquarters at 3500 South Clark Street, Arlington, Virginia, 22202.

12.	Upon information and belief, Lidl Management is the managing member of both Lidl US Ops and Lidl US.

## JURISDICTION AND VENUE

13.	Upon information and belief, complete diversity of citizenship exists between the Plaintiffs and the Defendants, as this action is between citizens of different states and involves a citizen or subject of a foreign state as an additional party.

14.     The amount in controversy, exclusive of interest and costs, exceeds Seventy-Five Thousand ($75,000.00) Dollars.

15.     Upon information and belief, therefore, this Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C.A. § 1332.

16.     This Court has personal jurisdiction over Defendants because they conduct business in this judicial district, and the subject matter of this action arises from the actions and omissions of the Defendants in this judicial district.

17.     Upon information and belief, venue is proper in this judicial district pursuant to 28 U.S.C.A. §§ 1391 and 1392.

18.     A substantial part of the events or omissions giving rise to the claims discussed herein occurred in this judicial district, and two of the properties that are the subject of this action are situated in this judicial district.

19.     In addition, Plaintiffs and Defendants have done business and are doing business within this judicial district, as more fully set forth herein.

20.     All conditions precedent to filing this action have been performed or have occurred, including but not limited to that the filing of this action is prior to the expiration of any applicable deadlines, statutes of limitations, and/or statutes of repose.

## GENERAL FACTS

### A. Lidl's U.S. Expansion Plan and Background

21.     Lidl is a German global discount supermarket chain that is Europe's largest discount grocery retailer and which dominates its industry sector in many European markets.  It is now apparent that Lidl naively believed that its dominance in Europe could translate to eventual dominance in the hyper-competitive retail grocery market of the United States of America ("US").

22.     Lidl sought to force its success in the US and crafted an overly ambitious plan to expand its retail grocery operations into the lucrative US market – which plans included building **hundreds** of Lidl-branded discount supermarkets/grocery stores in the United Spaces, with a specific early emphasis on the Mid-Atlantic area, including North Carolina.  Lidl was posed to compete with long established and well capitalized US grocery giants such as Kroger, Publix, Whole Foods, Wal-Mart, and other such retailers who were already in the middle of a grocery price war (the "US expansion plan").

23.     By mid-2018, Lidl planned to open at least 100 stores with as many as 50 more to open in the second half of 2018 and hundreds more in the coming years across the United States.

24.     Lidl ordered its real estate acquisition managers to quickly acquire not only dozens of strategic real estate tracts throughout North Carolina, but also hundreds of sites in other US states.  Nearly all Lidl's selected sites were strategically located near or across from existing or planned competitor grocery stores.

25.     As part of its US expansion plan, Lidl approached Leon, through an agent in 2014 and then directly in 2015, and started soliciting Leon to acquire and/or sell real estate parcels and act as a developer for Lidl grocery store-anchored retail and mixed-use centers in North Carolina.

26.     Lidl stated to Leon that, as part of its expansion plan, it intended to build Lidl stores throughout North Carolina, including in Cary, Wilmington, and the Steele Creek area of Charlotte. Lidl asked Leon to acquire tracts for Lidl in those locations that were identified by Lidl as meeting its expansion criteria, including being near competitor grocery stores.

27.     Leon ultimately agreed to act as a developer and acquire the property for three Lidl grocery store-anchored retail and mixed-use centers in North Carolina which are discussed and

defined below as the Cary Development, the Wilmington Development, and the Charlotte Development (the "Developments").

28. Upon information and belief, Lidl, thereafter, knowingly deceived Leon and made a series of false representations and promises on which Leon detrimentally relied upon in investing significant resources in the Developments, including on behalf of Lidl, towards which Lidl agreed to contribute, but which eventually left Leon holding "the bag" of financial losses, liens, claims, and obligations to multiple contractors.

29. Lidl, without cause, wrongly terminated, or repudiated, its agreements with Leon for each of the Developments on or about the following dates:

    a. Cary: 15 December 2017

    b. Wilmington: 3 November 2017

    c. Charlotte: 4 January 2018.

## B. Lidl's Business Malfeasance: Fraud or Gross Negligence?

30. Based on the actions of Lidl and Leon's experience with Lidl, Lidl sought to first tie up hundreds of strategic and high-demand real estate parcels and then determine whether Lidl stores would be economically viable in those locations. As such, Lidl either undeniably knew or should have known, in its early planning stages, that it would not close on all of the parcels it would put under contract for purchase. At the very least, Lidl certainly knew that it would not close on its purchases in the Developments well before it informed Leon of the same and certainly well before Leon had invested significant resources on the Developments.

31. The facts described herein lead to only two possible conclusions:

    a. Lidl knew it was gambling with its overly ambitious expansion plan and designed an emergency exit constructed on deception and bad faith. In so doing, Lidl wrongly refused to satisfy its liabilities and obligations and, rather,

attempted to transfer full financial liability to Leon and other similarly situated developers and owners; or

b.  Lidl was grossly negligent in the execution of its US expansion plan and committed business malfeasance on an epic scale and then purposefully left innocent third parties with significant economic losses.

32.     Lidl's own leadership has all but admitted Lidl's gross negligence in executing the US expansion plan:  in a January 2018 interview with German magazine *Manager Magazin*, Lidl's CEO Klaus Gehrig described Lidl's US expansion as a "a singular catastrophe" noting that Lidl did a "poor job" selecting locations and selected stores that were too big and expensive to be profitable.  *Manager Magazin* called Lidl's US expansion a "botched expansion", a "disaster", a "fiasco", and a "debacle."

33.     Lidl, when the following facts are considered, certainly appears to have planned for the eventuality of terminating related contracts and agreements as it saw fit when the time was convenient to Lidl and when it could shift, through false representations, financial risk to US-based local developers, contractors, owners, suppliers, and other third parties:

a.  Upon information and belief, Lidl knowingly acquired more real estate tracts than it could possibly close on and construct/operate stores. Lidl, between 2015 and 2017, acquired or entered purchase agreements for approximately 400 US real estate sites, yet by its own admission, only intended to construct around 100-150 stores by the end of 2018.  In fact, Lidl, as of June 2017, only had one operational US warehouse and distribution center, making it nearly impossible to open stores which were to be spread out between New Jersey in the North to Ohio in the Midwest to Georgia in the South and Texas in the Southwest.

b.  Lidl forced Leon and other owners and developers to use Lidl's own standard form Purchase and Sale Agreement ("Lidl Form PSA").  Upon information and belief, Lidl purposely drafted ambiguous form contracts on which it intended to rely to terminate, without cause, while avoiding financial liabilities by transferring the same to third parties. Lidl's Form PSA was neither specifically tailored for a grocery store-anchored multi-use development, nor did it contemplate the necessity of site and infrastructure development as required for the Developments – rather it left such items to be negotiated after signing of the Lidl Form PSA.  Upon information and belief, Lidl had purposely written into the PSA ambiguous and subjective terms which it intended to rely upon, and

did rely upon, in terminating its contracts with Leon and other similarly situated parties.

c. Lidl, likely knowing it would not close on many of its PSAs, delayed negotiations and execution of necessary agreements regarding cost sharing of site work and infrastructure for the Developments until the planned closing dates, demanding that Leon and others similarly-situated carry such costs until or after closing so that if Lidl chose to terminate, Lidl would not be saddled with these expenses. The Lidl Form PSA required the parties to negotiate and draft a separate Site Development Agreement ("SDA")[2] during the initial 90-day "Inspection Period", which SDA would memorialize Lidl's agreement to pay its pro rata share of the infrastructure and site development work for the Development. Lidl failed and refused to negotiate in good faith and demanded that development work continue without such signing by falsely promising to close on the purchases.

d. Lidl, while requesting and receiving closing date extensions based on its false representations, acted to remove mutuality of obligations from agreements with Leon. After signing the PSAs related to the Development, Lidl insisted on the inclusion of a new signature clause in an amendment: "This Amendment shall be enforceable in all respects against Seller upon Seller's execution and delivery hereof prior to the countersignature by Purchaser." Lidl stated that the reason was that the company officer who must review and execute was based in Germany and traveled often and was unable to sign for weeks. Lidl actually used this clause to obtain closing date extensions and to convince Leon to continue funding the Developments, so that Lidl would later be able to deny enforceability of the related amendments against it when it failed to close and execute SDAs.

e. Lidl used management turnover in its US operations to deny the existence of written and verbal agreements between Lidl and Leon while avoiding signing fully-memorialized contracts related to cost sharing for the Developments.

f. In mid to late 2017, upon information and belief, Lidl modified its US expansion plan to only open 20 stores or less in 2018, a fraction of the planned openings for properties under contract, but hid this fact from Leon and others until Lidl abruptly terminated their agreements in November and December 2017.

g. Lidl misled Leon and others about the performance and success of its US expansion. Lidl, as late as September 2017, was proclaiming, through its US spokesman and other representatives, that Lidl was "delighted" with its US performance and that such performance so far exceeded expectations. This

---

[2] The SDA would set forth the site development work and infrastructure to be completed by Leon, or its affiliates, based on site plans, engineering, and requirements of governmental entities and Lidl's pro rata share of the costs related to the same.

same sentiment and representations were presented to Leon to convince it to continue investing on behalf of Lidl. In actuality, Lidl had only opened 37 stores by that point and Lidl admitted in 2018 that the performance of many of those stores was "frighteningly weak" and that its US expansion plan and operations were a failure.

h. Lidl after its wrongful termination of the Wilmington Development agreements on 3 November 2017, continued to send written assurances to Leon that it intended to go through with the Cary Development and Charlotte Development. On November 15, 2017, Lidl's Director of Real Estate wrote to Leon "I am sorry that we could not close on the deal [Wilmington], **but we look forward to getting the other deals [Cary and Charlotte] across the finish line**." (emphasis added)

i. Lidl, in an effort to get Leon to continue its investments after it reneged on Wilmington, told Leon in early December 2017 that Lidl planned to work with Leon on other sites and developments in North Carolina, including in Cornelius.

34.     At a minimum, Lidl certainly set itself up for failure and was grossly negligent in its execution of the US expansion plan.  In addition to the acts of Lidl set forth in the paragraphs above, Lidl was further grossly negligent when the following are considered:

a. As reported by *Manager Magazin* in its February edition:

    i. In identifying places to build new stores, Lidl's US team didn't do enough research into the neighborhoods it chose to serve, instead settling for any "plots that were currently available, as long as they were on a busy road," and German officials "were usually content to look at locations on Google Maps" before okaying the choices.

    ii. Lidl US CEO Brendan Proctor, previously CEO of Lidl's Ireland division, "had no feel for the American market, which is significantly different from Europe."

    iii. Notably, Lidl's US expansion team was young and unseasoned with an average age in the mid-20s.

    iv. Only one warehouse was operational at the time of the first store openings in summer 2017. That meant trucks had to travel for hundreds of miles to stock far-flung stores. Some products were reportedly expired by the time they finally got where they were going, and some products advertised in the sales circular arrived only after the sales were over.

v. Newly-built stores weren't equipped with backup generators, leading to embarrassing situations where stores had to close when power was lost during summertime outages.

b. Lidl planned stores which were 35% larger than their European stores, with high operating costs, and the construction costs per square foot were significantly higher than many competitors, leading to higher overhead and operating losses.

c. Lidl's US offices were plagued with high personnel turnover and projects which were quickly falling behind because of turnover, inexperience, and understaffing.

d. Under the speed with which Lidl was moving with its US expansion, Lidl left its US offices understaffed to properly manage the acquisitions and development and manage the projects Lidl had undertaken.

e. Lidl underestimated the time it would take to get permits and applicable approvals for its stores, especially in urban markets.

35. By 2017, Lidl's US expansion plan was in total chaos, and Lidl fired its head of US operations, Daniel Marasch, and replaced him with Michael Aranda – former CEO of Lidl Spain – to salvage the US expansion plan and stop the bleeding.

36. Upon information and belief, Schwarz Group and Lidl Siftung gave Mr. Aranda marching orders to mitigate Lidl's damages and liabilities by, *inter alia,* manufacturing alleged breaches or defaults and then terminate purchase and sale agreements and other related development contracts where the resulting losses from claims would be less than the millions that Lidl stood to lose from opening and operating the stores.

37. Upon information and belief, Lidl started utilizing its high personnel turnover to deny the existence of agreements with Leon that had been reached by prior management and to renegotiate terms – with new managers claiming that they had no knowledge of the prior agreement, despite the same being in writing or in meeting minutes.

38. When Leon pushed backed and demanded that Lidl honor its prior agreements, without more concessions, Lidl soon placed the Developments on the chopping block.

## C. Lidl's Pattern of Conduct

39. By late 2017, upon information and belief, Lidl Stiftung and Schwarz Group ordered Lidl US and Lidl US Ops to postpone store openings, terminate purchase and development contracts, and halt construction of numerous stores in Texas,[34] Georgia,[5] Ohio,[6] Pennsylvania,[7] Maryland,[8] Virginia,[9] North Carolina[10] and other states, leaving a litany of broken promises, foreclosures, defaulted contracts, unpaid contractors, and financial hardships for local property owners, contractors, subcontractors, architects, engineers, and developers.

40. Media and industry sources currently report that Lidl may walk away from half of the sites it had selected with the intent of leaving many more innocent third parties suffering from significant financial losses.

41. Leon's story is not unusual even in North Carolina - one North Carolina developer who teamed with Lidl to develop a Lidl-anchored center in Burlington, NC, now faces foreclosure, judgments, liens, and a litany of claims and lawsuits.[11]

---

[3] https://www.houstonchronicle.com/business/retail/article/Is-Lidl-coming-to-Houston-Brokers-not-sure-12544831.php
[4] http://www.star-telegram.com/news/local/community/mansfield-news-mirror/mnm-news/article193912204.html
[5] http://www.reporternewspapers.net/2017/04/13/german-grocer-lidl-kills-proposed-sandy-springs-store/
[6] http://www.wfmj.com/story/36856403/lidl-backs-out-of-property-purchase-and-grocery-store-in-austintown
[7] http://lancasteronline.com/business/local_business/lidl-cancels-lincoln-highway-east-store-plan-grocer-s-plan/article_1af7e5cc-c8b1-11e7-bb8f-d7c19ea43872.html
[8] http://www.cecildaily.com/business/elkton-lidl-store-stalls-newark-site-still-on-track/article_841d4c78-937c-5295-a6d4-0178a5622710.html
[9] https://www.newsleader.com/story/news/2017/12/01/lidl-grocery-store-no-longer-coming-staunton/914037001/
[10] http://www.charlotteobserver.com/news/business/biz-columns-blogs/whats-in-store/article183059366.html
[11] http://www.thetimesnews.com/news/20180130/planned-lidl-sheetz-site-in-burlington-is-for-sale

42.     Coupled with the allegations and reports set forth above in Section B, it is evident that Lidl's actions exhibit a pattern of conduct rampant in its US operations.

43.     Leon is just one of many similarly-situated entities that has fallen victim to Lidl's pattern of fraud and deception.

## D. The Lidl-Anchored Developments

### Cary Development

44.     In August 2015, LG Acquisitions, an affiliate of Leon Capital, entered into a Purchase Agreement dated 11 August 2015 (the "Sears Agreement") for the purchase of approximately 20.73 acres located at 4429 NC Highway 55, Cary, North Carolina (the "Cary Property"). LG Acquisitions subsequently assigned the Sears Agreement to LG Cary.

45.     Lidl had represented to Leon that it desired to purchase an approximate 4-acre portion of the Cary Property for the purposes of constructing and operating a 36,000+ sq. ft. Lidl standalone grocery store.  Lidl stated that it was interested in this particular parcel because of its proximity to a nearby Whole Foods store and a nearby Harris Teeter grocery store and on the basis that it met its acquisition and development criteria for its US expansion plans.

46.     Lidl represented to Leon, via numerous verbal assertions and emails, that it would act as the anchor of the development of a mixed-use center on the Cary Property so long as the planned development was approved by the Town of Cary.

47.     On or about 8 September 2015, Lidl US presented a Letter of Intent (the "Cary LOI") to Leon regarding the purchase of approximately 4 acres of the Cary Property (the "Cary Lidl Tract").  Leon signed the Cary LOI on 20 September 2015.

48.     Notably, the Cary LOI included the following paragraph 12:

**Purchase and Sale Agreement:** The Buyer has a Standard Purchase and Sale Agreement which is used in all real estate acquisitions. Given the scale and speed of the current acquisitions phase, the Buyer requires the use of this Standard Purchase and Sale Agreement in all transactions.

49.     In the Cary LOI, Lidl agreed to and contemplated, among other things: closing on the purchase of the Lidl Cary Tract within 30 days of obtaining all applicable approvals and permits required to operate its business; a 90-day inspection period of due diligence; the use of the Lidl Form PSA; and, ultimately, "post-closing improvements" to include site development separate and apart from the purchase of the raw land, including the payment of its pro rata share of Leon's costs for its site work for the entire Cary Property.

50.     Because Lidl demanded that the parties use the Lidl Form PSA, which was meant primarily for the purchase of raw land, Lidl and Leon, at all times, understood and agreed – and, indeed, the PSA referenced – that the parties would negotiate and draft a separate Site Development Agreement ("SDA") and Reciprocal Easement Agreement ("REA")[12] and that the Lidl Form PSA would only cover the actual purchase of the Lidl Cary Tract portion of the Cary Property. The SDA would set forth the site development work and infrastructure to be completed by Leon, or its affiliates, based on site plans, engineering, and requirements of governmental entities and Lidl's pro rata share of the costs related to the same.

51.     Lidl, at the last minute before signing the Cary PSA, inserted a $998,627 cap on its pro rata share of the site work, infrastructure, and other development costs. Leon objected because it knew such cost share would likely be in excess of this cap, but Lidl represented to Leon that the actual number would be finalized in the SDA as certain costs were unknown at the time – Lidl

---

[12] Typically, REAs are used when a property is owned by more than one person or entity, and the persons or entities wish to develop the property as an integrated retail or mixed-use center. The REA would cover such things as the construction of the development, the architectural compatibility of the buildings, and the use of the common areas, access to parking, utilities, and other infrastructure components.

acknowledged the same in its Exhibit E (site work items list) to the Cary PSA – "THIS LIST IS NOT COMPLETE, REMAINING ITEMS AND SPECIFICATIONS TO BE PROVIDED BY LIDL ENGINEER DURING INSPECTION PERIOD." Leon accepted this representation expecting that the SDA would be modified with the later estimates or actual costs but that did not occur due to Lidl's deceptive delay tactics.

52.     On 29 December 2015, LG Acquisitions, as seller, executed Lidl's Form PSA for the Lidl Cary Tract (the "Cary PSA") and, in turn, on 30 December 2015, Lidl US Management, on behalf of Lidl US Ops, as buyer, executed the Cary PSA for the Cary Lidl Tract. LG Acquisitions later assigned the Cary PSA to LG Cary.

53.     The Cary PSA states, among other things, that Lidl had a 90-day "Inspection Period" window after Leon delivered the "Due Diligence Items" during which Lidl could terminate the Cary PSA with or without cause. After expiration of the Inspection Period, the terms in the PSA provided limited bases under Section 8 from which Lidl could terminate the Cary PSA prior to the Closing Date.

54.     The Cary PSA includes a draft site plan that evidenced the development plans for the Cary Property – the construction of the Lidl store, multi-family residential, and additional retail and commercial space, the remainder of which Leon intended to develop (the "Cary Development").

55.     On 5 January 2016, Leon delivered to Lidl the Due Diligence Items.

56.     On 17 March 2016, Lidl's counsel emailed Leon's counsel Lidl's drafts of the proposed SDA and REA.

57.     During early 2016, Leon's engineers and Lidl's engineers worked together to lay out the site for the Cary Development based on numerous and various requests and demands of

Lidl with regards to location, access, parking, and other similar site and infrastructure criteria and complexities.

58. Between March 2016 and October 2016, respective counsel for Lidl and Leon negotiated and exchanged multiple drafts of the proposed SDA.

59. On 19 October 2016, Lidl modified the proposed SDA to include a requirement that Leon construct a finished pad for the Lidl store – this was an addition to the agreed-upon site work to be completed by Lidl.

60. As a result of Lidl's new request for a completed pad and other requested changes to the planned site and its infrastructure, Lidl's estimated pro rata share of site development costs, including a finished pad, rose to over $1.6 million.

61. Additionally, Lidl required an amendment to the Cary PSA concerning the purchase of an additional portion of the Cary Property to increase the size of the Lidl Cary Tract to accommodate Lidl's access to a stormwater pond.

62. Due to Lidl's requested changes and other factors, the parties executed four separate amendments to the Cary PSA: First Amendment dated 30 March 2017, Second Amendment dated 31 July 2017, Third Amendment dated 4 October 2017, and Fourth Amendment dated 16 November 2017 (the "Cary PSA Amendments"). The Cary PSA Amendments modified the Cary PSA to increase the size of the Lidl Cary Tract to 4.839 acres, recognized a finalized site plan, and scheduled closing of Lidl's purchase of the Lidl Cary Tract to occur on or before 18 December 2017.

63. While the Cary PSA Amendments did not address the increase in the cap on Lidl's pro rata costs to be finalized in the SDA, Lidl representatives in several conversations and correspondence with Leon representatives had previously affirmed that Lidl would agree to an

increase or removal of the cap to reflect its actual pro rata share once final bids or estimates were received, including for the finished pad for the Lidl store.

64.    In reliance on Lidl's written and verbal representations regarding its intent to close on the Lidl Cary Tract and construct and operate a Lidl store thereon, on 31 August 2017, Leon proceeded with its acquisition and closed on its purchase of the Cary Property.

65.    Over the next few months, Leon and Lidl continued to negotiate terms of the SDA and REA; however, the parties were delayed in finalizing drafts of the same, in large part, because of numerous personnel changes at Lidl's North Carolina office and in Lidl US offices and Lidl's failure to fully inform its new personnel about prior negotiations and agreements with Leon. Additionally, upon information and belief, Schwarz Group and/or Lidl Stiftung orchestrated purposeful delays to allow them additional time to evaluate their US expansion plans before closing on related tracts.

66.    These actions, among others, indicate that Lidl failed and refused to "negotiate in good faith in an effort" to agree upon a form SDA for the Cary Development prior to the expiration of the Inspection Period.

67.    In October, Lidl continued to intentionally lead Leon to believe that it was intent on closing its purchase and proceeding with the Cary Development. For example, Lidl asked Leon whether Lidl's delay in building the Lidl store would affect Leon's ability to connect the Lidl Cary Tract to the neighboring Whole Foods-anchored retail center and negatively impact Leon's construction and sale of its planned apartments and other parts of the Cary Development.

68.    On 27 October 2017, Lidl's counsel emailed drafts of closing documents for the Cary Property, followed on the 30th by a revised proposed SDA, and finally, on the 31st, emailed

its proposed Fourth Amendment requesting an extension of the outside closing date from 16 November 2017 to 18 December 2017.

69.    Even after Lidl backed out of the Wilmington Development, Lidl continued to give written and verbal assure to Leon that it intended to honor its obligations related to the Cary Development and Charlotte Development and get those deals "across the finish line."

70.    Lidl waited until the closing date of 16 November 2017 to sign the Fourth Amendment and did not even send Leon a copy of the signed Fourth Amendment until 21 November 2017 after demands for the same from Leon.

71.    As of 30 November 2017, the parties had agreed to the final material terms of the REA and SDA, but Lidl continued to delay its signing of both documents.

72.    As of 5 December 2017, Leon was ready, willing and able to close on its sale of the Lidl Cary Tract to Lidl as all conditions precedent had been fulfilled under the PSA.

73.    On 6 December 2017, Lidl requested that Leon grant it another extension on the closing date, which Leon denied due to, among other things, the stifling and substantial costs and expenses related to the Cary Development that Leon was carrying and Lidl's failure and refusal to honors its obligations related to the Wilmington Development after obtaining multiple extensions.

74.    After Leon's denial of the extension, Lidl represented to Leon that it still intended to close on the 18th – requesting loan payoff information, closing statements, seller information sheets, and other necessary closing items.

75.    On 13/14 December 2017, counsel for Leon sent to Lidl the applicable final closing documents and sent hard copies by FedEx to Lidl and its closing agent on 15 December 2017. Leon was ready, willing, and able to close on the sale of the Lidl Cary Tract.

76.     On 15 December 2017, Lidl, abruptly and without warning to Leon, and in spite of prior representations to the contrary, terminated the Cary PSA and notified all parties that it did not intend to close on its purchase of the Lidl Cary Tract.  Lidl provided no basis under the Cary PSA to terminate the same.

77.     Upon information and belief, Schwarz Gruppe and Lidl Siftung were actively planning to terminate its agreements in relation to the Cary Development while Lidl's US entities were actively seeking extension of closing dates and making the above-described representations and promises to Leon on which it relied in continuing to expend funds, time, and efforts in completing its obligations in relation to the Cary Development.

78.     Lidl's abrupt termination, without cause, of its agreements with Leon has resulted, and will continue to result in substantial losses, including lost profits, for Leon in relation to the Cary Development.  Leon must complete the site plan as it was approved and permitted by the Town of Cary which will include Leon completing the retail, commercial, and multi-family apartment portions, including all costs related to the same, components of which likely would not have been included but for Lidl's verbal and written promises and participation in this development. The lack of an anchor Lidl grocery store will significantly and negatively impact rents and/or sales prices for the retail, commercial, and apartments spaces in the Cary Development.  Additionally, Leon will incur significant increases in marketing expenses as well as carry expenses to mitigate its damages caused by Lidl.

**Wilmington Development**

79.     In late 2015 and early 2016, Lidl engaged Leon to develop a Lidl grocery store-anchored retail and commercial center in Wilmington.

80.     Leon worked with Lidl to identify a potential site for the planned Lidl store and development in Wilmington which would later be known as Arbor Commons ("Wilmington Development"), and the parties agreed to pursue the acquisition and development of an approximately 10-acre multi-parcel site known as 807 John D. Barry Drive and located at or near the intersections of John D. Barry Drive, S. 17th Street, and Peel St. in Wilmington (the "Wilmington Property").

81.     The Wilmington Property is situated adjacent to other retail developments which are respectively anchored by a Food Lion grocery store and a Publix grocery store. The Publix was under development in 2015/2016 and opened to the public in August 2016.

82.     The parties then worked out a potential site plan for the Wilmington Property (the "Wilmington Site Plan") which divided said property into three parcels – Parcel A (~1.15 acres), Parcel B (~2.45 ac.), and Parcel C (~3.86 acres).

83.     Lidl represented to Leon that it would purchase Parcel C (later increased to 4.06 acres by agreement of the parties) of the Wilmington Property (the "Lidl Wilmington Tract") and construct a Lidl store thereon, and agreed and represented to Leon that Leon would have the right and obligation to develop and market the two remaining tracts of the Wilmington Property. Lidl understood and represented to Leon that Leon's development of Parcels B and C with approximately 10,000 square feet of retail and 45,000 square feet of commercial space was beneficial to Lidl to create more traffic to its store and part of the consideration for Leon to acquire the entire Wilmington Property. Lidl knew that the viability of the other retail and commercial space would be dependent on the construction and operation of the Lidl store as an anchor and driver of the Wilmington Development.

84.     In reliance on Lidl's representations and promises, Leon worked to assemble the Wilmington Property, even before an LOI was issued, and to purchase the various parcels for the Wilmington Development. But for Lidl's involvement and agreement to anchor the Wilmington Development, Leon would not have acquired the properties and agreed to develop the same.

85.     On or about 25 September 2015, LG Acquisitions entered into a purchase and sale agreement to acquire the Wilmington Property from GWT Properties, LLC.

86.     On 16 February 2016, Lidl US, through its acquisition manager, executed a Letter of Intent ("Wilmington LOI") with regards to the acquisition, purchase, and site development of Parcel C. Once again, the LOI required that the parties use Lidl's standard PSA, which had been prepared by Lidl.

87.     Lidl used the Lidl Form PSA for the Lidl Wilmington Tract and presented it to Leon, who executed it on 25 February 2016 and returned it to Lidl, who executed it on 26 February 2016 (the "Wilmington PSA"). The Wilmington PSA mirrored the Cary PSA as it was based on the same Lidl Form PSA. LG Acquisitions assigned its rights under the Wilmington PSA to LG Wilmington.

88.     Lidl included in the Wilmington PSA a preliminary cap of $250,000 in its pro rata share of site development costs, which was subject to change, and anticipated a full SDA to be negotiated and executed by the parties based on the same understandings as the Cary Development.

89.     The Wilmington PSA set an outside closing date of 31 May 2017.

90.     Subsequently, Lidl and the City of Wilmington required Leon to construct additional roads and access infrastructure which was not originally contemplated by the parties. In June 2016, Lidl notified Leon that Lidl required that Leon construct an additional access road from Peel Street. In August 2016, the City of Wilmington notified Leon that another road, in

addition to the access road, would have to be built and maintained along the rear of the Wilmington Property connecting the parallel adjoining city streets.

91.     The total cost of the Lidl-required site work, including these additions, was $438,899.21.

92.     Just like with the Cary Development, Lidl failed and refused to "negotiate in good faith in an effort" to agree upon a form SDA for the Wilmington Development prior to the expiration of the Inspection Period.

93.     Nevertheless, based on Lidl's written representations and verbal promises that it would pay the additional costs of this infrastructure improvement which would only serve Lidl's store, Leon agreed to construct the additional truck access.

94.     The City of Wilmington notified Lidl and Leon that it would not approve the Wilmington Development until the access streets and other site work were completed.

95.     Leon stated to Lidl that Lidl would need to agree to increase its contribution to cover these unanticipated infrastructure costs. Leon represented to Lidl that its contribution would need to increase to approximately $475,000.00.  Lidl agreed to cover the increased costs, once the same were finalized, and told Leon to proceed with the necessary site work and infrastructure necessary for the City of Wilmington to approve all applicable permits, rezoning, and plans.

96.     The Wilmington PSA anticipated that most of the site work would be done after closing and that a separate SDA would be negotiated and executed by the parties.

97.     In September 2016, Leon requested an amendment to the Wilmington PSA to reflect the change in circumstances and increase in Lidl's contribution, but Lidl declined and stated to Leon that it would take too long for Lidl to get internal approval for such an amendment which would delay the work from starting; rather, Lidl offered and agreed to include the $475,000

contribution in the SDA, to be finalized and executed at a later date and stated that the parties would true up at closing with Lidl paying the $475,000 to Leon.

98.     Leon, relying on Lidl's agreement in emails and verbal affirmations to pay its share of the costs, agreed to proceed with the purchase of the Wilmington Property and the site work prior to the execution of the SDA or any amendment to the Wilmington PSA.

99.     On 24 October 2016, Leon closed on its purchase of the Wilmington Property and proceeded with its work related to the Wilmington Development.

100.    On 16 February 2017, a Lidl representative, Ashley Peace, confirmed that its engineers had reviewed the site plans and related site work costs and approved the same and that Lidl, once again, agreed to pay up to $475,000 for site work and related infrastructure costs.

101.    In March/April 2017, Lidl US replaced its real estate director assigned to the Wilmington Development.  Turnover in Lidl US had become commonplace, and Leon was forced each time to reaffirm the prior transactions and agreements between the parties.

102.    Lidl's new real estate director, Christopher Kapper, confirmed to Leon that Lidl had agreed to pay $475,000 and that Lidl preferred that this be included in the SDA rather than in an amendment to the Wilmington PSA.

103.    In late April 2017, Lidl requested that Leon agree to an extension of the closing date because Lidl would be unable to obtain certain permits prior to the May 2017 closing date.

104.    Upon information and belief, around this time, Schwarz Group and Lidl Stiftung began to realize that their overly ambitious US expansion plan may not be economically viable and changes would have to be made, including cancellations of planned projects and developments and they began to actively consider terminating Lidl's various agreements with Leon. Nevertheless, Lidl continued to make promises and representations to Leon to encourage it to

detrimentally rely on the same and continue spending its time, money, and efforts on the subject developments.

105.    Lidl and Leon prepared the First Amendment to the Wilmington PSA and the parties executed the same in late May/early June.  The First Amendment pushed the outside closing date to 30 September 2017.

106.    Interestingly, and as a harbinger of things to come, Lidl insisted on the inclusion of a new signature clause in the First Amendment: "This Amendment shall be enforceable in all respects against Seller upon Seller's execution and delivery hereof prior to the countersignature by Purchaser."

107.    Leon originally objected to the inclusion of this signature clause; however, Lidl falsely assured Leon that it wanted to include the sentence because its new contracts, including modifications and amendments, must be approved for signature by an official in Germany who was traveling frequently and taking up to 2+ weeks to sign various agreements.  Lidl said it wanted to avoid further delays and did not want any delay in obtaining its necessary signature to delay progress on the Wilmington Development, including completion of site work and off-site infrastructure, or the necessary extension of closing dates by waiting on Lidl to execute,

108.    Upon information and belief, Lidl actually added this signature clause in an effort to make it easier for Lidl to back out of agreements as Lidl's expansion plans and US operations were falling into disarray, while forcing Leon and other like developers to continue with the development of projects until Lidl had determined which projects it should cancel.

109.    On 12 July 2017, at a meeting in the Lidl Raleigh office between the parties to discuss open issues with the Wilmington Development, Lidl represented to Leon that it was still

in agreement with regards to raising its pro rata cap to $475,000 and paying the same at or before closing.

110.    On 14 July 2017, Lidl Development Manager Christopher ("Chris") Kapper, sent an email to Leon stating as follows:

> I agree that we need to pay for our pro-rata on the road as the road was constructed to service our delivery trucks. We will need to memorialize the change and have contractor back up for the SDA. The SDA will need to include language that the Site Development Agreement terms trump the terms of the PSA.

111.    Later in July, upon information and belief, Lidl Stiftung replaced Chris Kapper with John Raymond as its developer manager for the Developments. By August, Lidl Stiftung replaced John Raymond with Andrew Gartrell.

112.    Lidl's managers for the Developments were replaced at an unusually high frequency which led to unnecessary delays and allowed Lidl to alter its promises at will.

113.     Upon information and belief, Lidl continued posturing in anticipation of canceling the project and limiting its exposure. After Leon had expended millions of dollars on the Wilmington Development in reliance on Lidl's promises, Lidl and its in-house counsel began denying that it had ever agreed to an increase in its pro rata contribution to $475,000 and that such was limited to $250,000 per the PSA, despite the numerous emails, meeting minutes, and other written agreements between the parties which unequivocally stated to the contrary.

114.    Additionally, Lidl now claimed that Leon was required to provide Lidl with a finished pad, despite the same not being included in the Wilmington PSA or having been previously discussed by the parties. Leon provided prior emails and other documents to Lidl showing that the finished pad was not included in the site work. In fact, Lidl had never provided pad specification to Leon.

115.   On 29 August 2017, Lidl emailed Leon acknowledging that Leon had completed much of the site work as agreed by the parties and requested that finalized invoices and proof of expenses and costs be provided.

116.   By September, Lidl began claiming that, per its survey, over $115,000 worth of dirt would need to be added to the Lidl Wilmington Tract and demanded that Leon reduced its contract price by said amount.  Leon proved to Lidl that Lidl's survey used incorrect data and information, which forced Lidl to drop this claim.

117.   On 18 September 2017, Lidl requested that Leon grant another extension to the closing date.  Leon agreed to grant an extension so long as Lidl would agree to pay its final calculated pro rata share of site work and infrastructure costs in the amount of approximately $438,000.

118.   On 19 September 2017, Mr. Gartrell, on behalf of Lidl, emailed counsel for Leon stating that Lidl agreed to pay $438,000+ to Leon on the extended closing date:

> In the interest of moving forward, I'm ready to agree to amend the PSA to include the offsite work provided we can get a 30 day extension now.  The $438,000 figure you provided should be fine as long as the pay apps align with the figures you sent and the tests don't reveal any issues – which I don't think either of us expect.  Can we agree to the 30 day extension now?

Leon agreed to grant a 30-day extension in reliance on Mr. Gartrell's email.

119.   On 21 September 2017, Lidl sent Leon its proposed Second Amendment to the Wilmington PSA, which changed the closing date to no later than 20 October 2017.  Leon revised the proposed Second Amendment to include, among other things, an acknowledgement by the parties that "all of the Site Work anticipated by the Agreement [Wilmington PSA] has been performed" and "Purchaser has agreed that its payment for its pro rata share of the Site Work shall be in the amount of Four-Hundred Thirty-Eight Thousand Eight Hundred Ninety-Nine and 21/100

Dollars ($438,899.21)." Leon emailed a copy of this revision to Lidl, and Lidl agreed to the revisions, in writing.

120.    Leon signed the Second Amendment on 22 September 2017 and sent to Lidl for signature.

121.    On 27 September 2017, counsel for Lidl sent Leon its proposed draft closing documents and represented to Leon that it intended to move forward with closing on the October 20th closing date agreed to by the parties in the Second Amendment. Counsel for Lidl and Leon then continued exchanging various revisions and drafts of closing documents in anticipation of closing on 20 October 2017.

122.    At no point did Lidl indicate that it would not execute the Second Amendment or that it did not agree to the terms thereof. Multiple Lidl representatives continued to represent to Leon that the amendment would be returned to Leon signed by Lidl. On 13 October 2017, Andrew Gartrell left Leon a voicemail stating:

> I assume you are calling about the amendment. . . What I have heard is that we are going to have our guys sign when the closing package is signed on Friday. But as I said I think the counterpart signatures allow for the agreement to be in effect as of when you sign it, and if you look at the Settlement Statement obviously the Site Development Costs are going to be included in that.

123.    Leon, again relying on Lidl's promises and assurances, to its detriment, continued funding work on the Wilmington Development and preparing for closing on the 20th.

124.    Lidl emailed Leon, just 4 days before the scheduled closing, to request yet another extension of the closing date. Lidl then followed up this request with calls to officials at Leon threatening to terminate the deal immediately if Leon did not agree to a 4-week extension.

125.    On 18 October 2017, Leon, with Lidl's threat of termination, reluctantly agreed to grant an extension and sent a proposed Third Amendment to the Wilmington PSA, which proposed

to extend the outside closing date to 17 November 2017 and included the language of the parties' prior agreement for Lidl to pay $438,899.21 for Site Work costs on the closing date. Lidl did not object and agreed to these terms.

126.    Leon signed the Third Amendment and sent to Lidl for signature on 19 October 2017.

127.    On 20 October 2017, Leon emailed Lidl to inquire about signature as this was the date of closing under the Second Amendment, and Conner Bevans, Lidl US Director of Real Estate, responded by email: "I am working to get it signed at our HQ right now."

128.    Leon followed up with Lidl numerous times thereafter inquiring about the execution of the Third Amendment and received no response until 3 November 2017.

129.    On 3 November 2017, counsel for Lidl emailed a termination letter of the same date to Leon (the "Wilmington Termination Letter") stating that Lidl "hereby exercises its right to terminate the Agreement [Wilmington PSA] pursuant to Section 8(a)(iii) of the Agreement."

130.    Upon information and belief, Lidl was claiming that the City of Wilmington had not issued its permit for Lidl to proceed with construction of its store; however, Leon contacted the City of Wilmington and verified that the City had approved all necessary approvals and permits for Lidl to proceed with construction on the Lidl Wilmington Tract.

131.    Lidl knowingly terminated the Wilmington PSA, as modified and amended, under false pretenses which it knew were false at the time it sent Leon the Wilmington Termination Letter.

132.    As of the time Lidl had attained all necessary permits and approvals to proceed with construction of the Lidl store on the Lidl Wilmington Tract, Leon had fulfilled all its obligations

under its agreements with Lidl and was ready, willing and able to close on each of the agreed upon outside closing dates set forth in the Amendments.

133.     Upon information and belief, while Lidl US Ops, Lidl US, and Lidl Management were making false representations to Leon regarding Lidl's intent to close and fulfill their promises to Leon regarding the Wilmington Development, Schwarz Group and Lidl Stiftung knew such statements were false and were actively planning to terminate Lidl's agreements with Leon and intended to not pay any of their share of the costs of the Site Work, including the additional infrastructure work requested by Lidl.

134.     To date, Lidl has failed and refused to pay Leon the agreed upon $438,899.21 pro rata share discussed above.

135.     Lidl's abrupt termination, without cause, of its agreements with Leon in relation to the Wilmington Development has resulted, and will continue to result in substantial losses, including lost profits, for Leon.  Leon must complete the site plan as it was approved and permitted by City of Wilmington which will include Leon completing the retail and commercial spaces, including all costs related to the same, components of which likely would not have been included but for Lidl's promises and participation in this development. The lack of an anchor Lidl grocery store will significantly and negatively impact rents and/or sales prices for the retail and commercial spaces in the Wilmington Development.  Additionally, Leon will incur significant increases in marketing expenses as well as carry expenses to mitigate its damages caused by Lidl.

### Charlotte Development

136.     In early 2016, Lidl also asked Leon to team with Lidl to develop a Lidl grocery store-anchored retail and commercial center in the fast-growing Steele Creek area of Charlotte, Mecklenburg County, North Carolina (the "Charlotte Development").

137.     Lidl identified the area of Steele Creek and potential parcels that met its requirements for its US expansion plan.

138.     Thereafter, Leon, in reliance on Lidl's promises regarding its role in the Charlotte Development, began its work to acquire the property required by Lidl for the Charlotte Development.

139.     On or about 18 March 2016, LG Acquisitions entered into three separate purchase and sale agreements to acquire the necessary real property: (1) the Purchase and Sale Agreement to acquire 13.1 acres (Meck. Co. Parcel ID 20109107) commonly known as 9501 Steele Creek Road, Charlotte, NC; (2) the Purchase and Sale Agreement for 0.5 acres (Meck. Co. Parcel ID 20109105) commonly known as 9601 Steele Creek Road, Charlotte, NC; and (3) the Purchase and Sale Agreement for 1.7 acres (Meck. Co. Parcel ID 20109106) commonly known as 9617 Steele Creek Road, Charlotte, NC (collectively, the "Steele Creek Property").

140.     Once Leon had acquired the rights to purchase the Steele Creek Property, Lidl modified its Lidl Form PSA for its purchase of a tract of the Steele Creek Property (the "Charlotte PSA") consisting of approximately 3.52 acres (the "Lidl Charlotte Tract").

141.     LG Acquisitions executed the Charlotte PSA on or about 7 June 2016. Lidl US Ops executed the Charlotte PSA on or about 8 June 2016.

142.     The Charlotte PSA included as an exhibit the site plan of the Charlotte Development which included a large multi-family component that would act as a complement to the Lidl grocery store and produce traffic.  Lidl and Leon worked together to lay out the site plan, and both understood and agreed that the Lidl grocery store was to anchor and complement the multi-family component of the Charlotte Development.

143.     On or about 2 September 2016, LG Acquisitions and Lidl US Ops executed the First Amendment to the Charlotte PSA which extended the "Inspection Period" to 30 November 2016, thereby also extending the "Outside Closing Date" to 30 November 2017.

144.     Lidl, during its work and development for its store of the Lidl Charlotte Tract, realized that it needed additional acreage for purposes of providing sufficient parking at the planned store. Lidl requested that Leon provide the additional acreage and rework the site plan and other applicable plans accordingly.

145.     On or about 20 October 2016, LG Acquisitions and Lidl US Ops executed the Second Amendment to the Charlotte PSA which, among other things, expanded the Charlotte Lidl Tract by approximately .43 acres to a total of approximately 3.95 acres, increased the purchase price by $298,425, and replaced the original site plan with a modified site plan reflecting the change in the Charlotte Lidl Tract.

146.     Thereafter, Leon continued to expend funds in planning and preparing for the development of the Steele Creek Property, including using its reasonable efforts to obtain all necessary governmental approvals in relation to the Charlotte Development.

147.     During this time between 2016 and the outside closing date, Lidl, as it had done with the other two Developments, misled Leon about the progress and success of its US expansion plan and its intention to close on the purchase of the Steele Creek Property. Lidl continued to assure Leon that everything was on track and that Lidl would close on the purchase of the Steele Creek Property, finalize an SDA, and pay its costs related to the Charlotte Development. All the while, Lidl knew that it would not, or was likely to not, close on the purchase and construct and operate a Lidle store thereon.

148.    Leading up to the outside closing date of 30 November 2017, Lidl began acting in a manner that led Leon to reasonably anticipate that Lidl would breach the Charlotte PSA and fail or refuse to close on its purchase of the Lidl Charlotte Tract or honors its obligations and promises with regards to the Charlotte Development.  Lidl did not appear to be advancing any efforts to construct and operate a Lidl grocery store in the Charlotte Development.  Lidl had, again, failed and refused to "negotiate in good faith in an effort" to agree upon a form SDA for the Charlotte Development prior to the expiration of the Inspection Period. Accordingly, to mitigate its mounting financial losses from Lidl's actions, Leon waited to close on its purchase of the Steele Creek Property until Lidl reconfirmed its commitment to the Charlotte Development.

149.    By October 2017, Lidl's estimated share of the cost of site work was approximately $1.4 million.

150.    To allow Lidl additional time, if needed, to honor its obligations in relation to the Charlotte Development, and to work out a price reduction for the Steele Creek Property in connection with the cost of site work, Leon agreed to extend the outside closing date to 31 December 2017 via a Third Amendment to the Charlotte PSA.

151.    The draft Third Amendment sent to Leon by Lidl included an Exhibit E consisting of site development specifications for the Lidl Charlotte Tract.

152.    On 28 November 2017, Leon submitted proposed revisions to the Third Amendment's Exhibit E, in response to which Lidl sent a revised Third Amendment, which provided that, upon execution and transmission by Leon, the Third Amendment would be enforceable against Leon but not against Lidl. Such provision imitated the same provision present in the relevant documents relating to the Cary Development and Wilmington Development.

153.     In response to inquiry regarding this provision, Lidl stated that such language was non-negotiable and standard practice for Lidl.  Lidl, once again, assured Leon that Lidl had every intention of closing on its purchase of this property and honoring its agreements related to the construction and operation of Lidl store thereon.

154.     In reliance on Lidl's false representations, on 28 November 2017, Leon signed the Third Amendment and requested Lidl's signature to the same.

155.     On 5 December 2017, Leon contacted Lidl with an update on the Steele Creek Property, noting that Leon was in discussions with the sellers of the Steele Creek Property to extend the outside closing date and adjust the sales price as contemplated previously, and that, once the amendment was completed, Leon was targeting a January resubmittal. In the same email, Leon requested from Lidl any changes to the current site plan.

156.     In response to the December 5th email, Lidl thanked Leon for the encouraging update and noted that its "fingers [were] crossed", thus misrepresenting to Leon that Lidl sought to pursue the closing of the Steele Creek Property, and implicitly acquiescing in Leon's continued efforts to proceed with the closing of the Steele Creek Property.

157.     On 4 January 2018, without any notice, counsel for Lidl US served a "Notice of Default" upon LG Acquisitions and Leon claiming that Leon was in default under the Charlotte PSA for failing to use "commercially reasonable efforts to obtain the Subdivision, Rezoning and Master Entitlement Approvals."  However, at all relevant times until Lidl's anticipatory breach or repudiation, Leon had used its commercially reasonable efforts to obtain the necessary approvals.

158.     As a result of Lidl's termination, without cause, of its agreements related to the Charlotte Development, Leon has lost the money it had invested in acquiring and developing the

Charlotte Property as well as its lost profits, sales, rents, and economic opportunities related to the Charlotte Development.

159. Once again, as with the Cary Development and Wilmington Development, Lidl failed to honor its obligations with the Charlotte Development.

160. Throughout its involvement with the Charlotte Development, again as was the case with the Cary Development and Wilmington Development, Lidl perpetuated a pattern of bad faith, lies, and deceit in order to induce Leon to rely upon its misrepresentations and continue to pour funds, resources, and time into a project that Lidl never intended to see come to life.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### (Specific Performance)

161. The preceding allegations are restated and incorporated herein by reference.

162. The respective Cary PSA, Wilmington PSA, and Charlotte PSA, as modified and amended (collectively, the Lidl PSAs), are valid and enforceable contracts between the parties.

163. The agreement between Lidl and Leon with respect to the site work on the Wilmington Development (the "Wilmington Site Work Contract") is a separate, if related, valid and enforceable express or implied-in-fact contract between the parties.

164. The relevant agreements, including the Lidl PSAs and the Wilmington Site Work Contract, between the parties with regards to the Cary Development, Wilmington Development, and Charlotte Development (the "Developments") (collectively, the "Lidl-Leon Contracts"), as described above, are all valid and enforceable contracts between the parties.

165. Lidl, as set forth above, is in breach of the Lidl-Leon Contracts.

166. Monetary damages are not adequate to make Leon whole due to the uniqueness of the real property and the Developments in question. The Lidl Cary Tract, Lidl Wilmington Tract,

and the Lidl Charlotte Tract (the "Lidl Tracts") are each unique. Leon, in conjunction with Lidl, specifically tailored the site plans, layout, infrastructure, marketing, and development for Lidl's anchor grocery stores and Lidl's intended uses.

167.    Leon has fulfilled all conditions, promises, and covenants to be performed by it, or is ready, willing, and able to do so, for Lidl to perform all relevant agreements between the parties.

168.    Upon information and belief, Lidl can perform its obligations under the relevant agreements between the parties in regard to the Developments.

169.    Accordingly, Lidl is obligated to specifically perform its obligations under the Lidl-Leon Contracts, including, without limitation, the purchase of the Lidl Tracts and payment of its pro rata share of site work and infrastructure costs.

## SECOND CAUSE OF ACTION
### (Breach of Contract)

170.    The preceding allegations are restated and incorporated herein by reference.

171.    If the Court finds that Leon is not entitled to specific performance, Leon seeks monetary damages for Lidl's breaches of the respective Lidl-Leon Contracts.

172.    The Lidl-Leon Contracts are valid and enforceable agreements between the respective Lidl and Leon entities.

173.    Lidl breached or wrongfully terminated the Lidl-Leon Contracts as set forth above and has failed to act in good faith as required by the Lidl-Leon Contracts.

174.    Leon has incurred significant costs and expenses on behalf of Lidl in acquiring the real property for the Developments as well as for the necessary planning, zoning, approvals, site work, infrastructure, and other work and materials necessary for the Developments.

175. As a consequence of Lidl's breaches, Leon, among other things, has been deprived of significant economic opportunities, rents, and profits in relation to the Developments. Such economic opportunities and profits were reasonably foreseeable by Lidl.

176. As a further consequence of Lidl's breaches, the Cary Property, Wilmington Property, and Steele Creek Property have diminished in fair market value.

177. As a further consequence of Lidl's breaches, Leon will be forced to remarket the Cary Development and Wilmington Development as well as alter its prior site plans, construction plans, and infrastructure plans.

178. Leon's damages were foreseeable and in the contemplation and understanding of the parties at the time they agreed to proceed with plans and agreements related to the Developments.

179. As a direct and proximate result of Lidl's breaches of the Lidl-Leon Contracts, Leon has been damaged in an amount in excess of one million dollars ($1,000,000.00).

### THIRD CAUSE OF ACTION
### (Breach of the Covenant of Good Faith and Fair Dealing)

180. The preceding allegations are restated and incorporated herein by reference.

181. Lidl had a duty to act in good faith and fair dealing with regards to the Lidl-Leon Contracts as well as the Developments.

182. Lidl, based on its acts and omissions, as set forth above, failed to act in good faith and fair dealing and, as such, breached the implied covenant of good faith and fair dealing.

183. As a direct and proximate result of Lidl's breaches of its duties, Leon has been damaged in an amount in excess of one million dollars ($1,000,000.00).

### FOURTH CAUSE OF ACTION
### (Negligent Misrepresentation)

184. The preceding allegations are restated and incorporated herein by reference.

185. Lidl possessed an affirmative duty to avoid any negligent misrepresentation or omission of material fact to Leon, particularly as such misrepresentations related to and concerned the SDAs and/or REAs for the Cary Property, Wilmington Property, and Steele Creek Property (collectively, the "Properties"), and/or related to and concerned the Developments, all of which constitutes work that falls outside of the scope of the Cary PSA, Wilmington PSA, and Steele Creek PSA.

186. Lidl breached this duty by failing to exercise reasonable care and competence in communicating or failing to communicate truthful and accurate information to Leon, as detailed above.

187. More specifically, and without limitation, Lidl negligently made misrepresentations to Leon as to Lidl's intent to act as an anchor for the mixed-use centers to be developed on the Properties; to close on the tracts under the PSAs; its intent to pay its pro rata share of Leon's costs for its site work at the Properties; its intent to cover the increased costs of developmental work at the Properties; its intent to negotiate in good faith and enter into enforceable SDAs and REAs for the Properties; its intent to develop and operate fully-running grocery stores as part of the mixed-use centers promised to Leon; and its intent to utilize the site work, infrastructure work, and other developmental work it requested of Leon.

188. Such negligent misrepresentations are set forth in more detail in the Development specific allegations above.

189. Lidl knew or should have known that the information supplied to Leon was false, particularly in light of Lidl's knowledge that its ambitious expansion plans were failing across the

country and Lidl Siftung and/or Schwarz Groupe were actively selecting projects to terminate as a result.

190.     Lidl knew or should have known that Leon would rely upon the representations by, among other things, proceeding with the Developments at the Properties as instructed by Lidl; continuing to perform site work, infrastructure work and other developmental work at the Properties, again as instructed by Lidl; continuing to proceed as though enforceable SDAs and REAs for the Properties would be executed; continuing to incur costs for the site work and development of the Properties as instructed by Lidl; and engaging and soliciting interest from third-parties for the purchase or lease of vacant space and for the conducting of other business at the Properties as part of the overall plan of the Properties.

191.     In addition, Lidl's negligent misrepresentations have caused Leon to be deprived of significant economic opportunities, rents, and profits in relation to the Developments; has caused a diminution in fair market value of the Properties; and will force Leon to remarket the Developments.

192.     In fact, Leon reasonably and justifiably relied on Lidl's misrepresentations and omissions to its detriment.

193.     As a direct and proximate result of Lidl's negligent representations and/or omissions, Leon has been damaged in an amount in excess of one million dollars ($1,000,000.00).

194.     Additionally, Leon is entitled to punitive damages and attorneys' fees as a result of the reckless and fraudulent conduct by Lidl, which conduct was also willful and malicious and caused willful and malicious injury to Leon.

**FIFTH CAUSE OF ACTION**
**(Actual Fraud)**

195.     The preceding allegations are restated and incorporated herein by reference.

196. Upon information and belief, Lidl, while making affirmative promises to get Leon to expend money, time, and effort on its behalf, had no intention to, among other things, close on the Properties; act as an anchor for the mixed-use centers to be developed on the Properties; pay its pro rata share of Leon's costs for its site work at the Properties; cover the increased costs of developmental work at the Properties; negotiate in good faith and enter into enforceable SDAs and REAs for the Properties; develop and operate fully-running grocery stores as part of the mixed-use centers promised to Leon; or utilize the site work, infrastructure work, and other developmental work it requested of Leon.

197. Upon information and belief, Lidl's actual intention was to create the appearance that it was going to proceed with the tasks set forth in the preceding paragraph, so that Leon would continue to move towards closing on and developing the Properties while Lidl decided which projects it would terminate in the US expansion plan.

198. To accomplish its deceptions, Lidl repeatedly made material misrepresentations and omissions to Leon, as detailed above, and including, but not limited to:

    a. Misrepresenting that it needed to extend the outside closing dates for the various Properties, on multiple occasions, for various reasons, when, in fact, Lidl only intended to buy time as it decided how to handle its failed entrepreneurial efforts in the United States, and before wrongfully terminating the Lidl-Leon Contracts;

    b. Misrepresenting that Lidl intended to pay its pro rata share of Leon's costs and any increased costs related to Leon's site and other developmental work at the Properties;

    c. Misrepresenting that Lidl intended to enter into enforceable SDAs and REAs for the Properties, by sending drafts and revisions back and forth, in order to continue to buy time and create the appearance that it would pursue such developmental plans post-closing;

    d. Misrepresenting its intent to develop and operate fully-running grocery stores as part of the mixed-use centers promised to Leon; and

e.    In other ways to be proven at the time of trial.

199.    Lidl's misrepresentations and omissions were calculated to deceive and, in fact, did deceive Leon.

200.    Lidl's misrepresentations and omissions were material and false, and Lidl knew or should have known its representations were false when made.

201.    Lidl intended for Leon to rely upon its statements and representations for Lidl's own gain and benefit, and indeed Leon did reasonably and justifiably rely upon Lidl's representations.

202.    Lidl's fraudulent conduct damaged Leon in that, among other things, Leon incurred significant costs in continuing to pursue the closing of the Properties; in continuing to perform site work, infrastructure work, and other developmental work related to the Properties, all at Leon's expense; and in continuing to solicit third-parties to move into the adjacent and vacant spaces at the Properties, all with the expectation and in reliance on the fact that Lidl would anchor the mixed-use centers and thus draw third-parties to the Properties.

203.    In addition, Lidl's fraudulent conduct has caused Leon to be deprived of significant economic opportunities, rents, and profits in relation to the Developments; has caused a diminution in fair market value of the Properties; and will force Leon to remarket the Cary Development and Wilmington Development.

204.    As a direct and proximate result of Lidl's fraudulent conduct, Leon has been damaged in an amount in excess of one million dollars ($1,000,000.00).

205.    Additionally, Leon is entitled to punitive damages and attorneys' fees as a result of the fraudulent conduct by Lidl, which conduct was also willful and malicious and caused willful and malicious injury to Leon.

## SIXTH CAUSE OF ACTION
### (Violations of the Unfair and Deceptive Trade Practices Act)

206.    The preceding allegations are restated and incorporated herein by reference.

207.    The above-referenced actions of Lidl were in commerce or affected commerce as set forth and defined in N.C.G.S. § 75-1.1 *et seq.*

208.    The above-referenced actions of Lidl constitute unfair and deceptive trade practices in violation of Chapter 75 of the North Carolina General Statutes, as, among other things, Lidl acted in a manner that was immoral, unethical, oppressive, had a tendency to deceive, and/or was substantially injurious to Leon.

209.    Upon information and belief, Lidl engaged in unfair and deceptive practices by, among other things, misrepresenting its intent to act as an anchor for the mixed-use centers to be developed on the Properties; misrepresenting its intent to pay its pro rata share of Leon's costs for its site work at the Properties; misrepresenting its intent to cover the increased costs of developmental work at the Properties; misrepresenting its intent to negotiate in good faith and enter into enforceable SDAs and REAs for the Properties; misrepresenting its intent to develop and operate fully-running grocery stores as part of the mixed-use centers promised to Leon; misrepresenting its intent to utilize the site work, infrastructure work, and other developmental work it requested of Leon; and misrepresenting that it needed to extend the outside closing dates for the various Properties, on multiple occasions, for various reasons, when, in fact, Lidl only intended to buy time as it decided how to handle its failed entrepreneurial efforts in the United States, and before wrongfully terminating the Lidl-Leon Contracts.

210.    As a direct and proximate result of Lidl's unfair and deceptive actions, Leon has been damaged in an amount in excess of one million dollars ($1,000,000.00).

211.     Pursuant to N.C.G.S. § 75-16, Leon is also entitled to recover from Lidl trebled compensatory damages.

212.     Pursuant to N.C.G.S. § 75-16.1, Leon is also entitled to recover from Lidl, its reasonable attorneys' fees.

## SEVENTH CAUSE OF ACTION
### (Tortious Interference with Prospective Economic Advantage)

213.     The preceding allegations are restated and incorporated herein by reference.

214.     At all times relevant to the facts alleged herein, Leon was pursuing and considering other contractual relations and economic advantages with various other purchasers, tenants and/or businesses for inclusion in the Developments.

215.     Lidl, acting without justification, by unjustifiably backing out of the Development, induce these third-parties to refrain from entering into contracts with Leon by reneging on the Lidl-Leon Contracts, thus causing to be deprived of significant economic opportunities, rents, and profits in relation to the Developments and the prospective economic advantages.

216.     Lidl acted to gain economic and business advantage at Leon's expense.

217.     Such prospective economic advantages would have ensued but for Lidl's interference.

218.     As a direct and proximate result of Lidl's tortious interference, Leon has been damaged in an amount in excess of one million dollars ($1,000,000.00).

219.     Additionally, Leon is entitled to punitive damages and attorneys' fees as a result of the conduct by Lidl, which conduct was also willful and malicious and caused willful and malicious injury to Leon.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully prays the Court as follows:

1. That Defendants be subject to specific performance of the relevant contracts pursuant to the First Cause of Action;

2. That Judgment be entered in favor of Plaintiffs and against Defendants, jointly and severally, in an amount to be proven at trial pursuant to all Causes of Action;

3. That Plaintiffs be awarded punitive damages pursuant to N.C. Gen. Stat. § 1D;

4. That Plaintiffs' compensatory damages be trebled pursuant to N.C. Gen. Stat. § 75-1.16 on the Sixth Cause of Action;

5. That Plaintiffs be awarded their reasonable attorneys' fees as allowed by law pursuant to N.C.G.S. § 75-16.1 and as allowed by contract, or for an award of Plaintiffs' attorneys' fees to the fullest extent allowed by North Carolina law;

6. That the costs of this action be taxed against Defendants, jointly and severally, as allowed by law;

7. For a trial by jury on all factual issues; and

8. For such other and further relief as the Court may deem just and proper.


Dated: 8 June 2018
Charlotte, North Carolina

Respectfully submitted,


By:   /s/ M. Aaron Lay
M. Aaron Lay (NC Bar No. 38797)
Carl J. Burchette (NC Bar No. 47617)
HAMILTON STEPHENS
STEELE + MARTIN, PLLC
525 N. Tryon St., Suite 1400
Charlotte, NC 28202
Telephone: 704-344-1117

Facsimile: 704-344-1483
malay@lawhssm.com;
cburchette@lawhssm.com
*Attorneys for Plaintiff*