UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NORTH CAROLINA
SOUTHERN DIVISION
No. 7:18-CV-104-BO

| | |
|---|---|
| LEON CAPITAL GROUP, LLC, LG ACQUISITIONS, LLC, LG CARY ATC LAND, LLC, and LG JOHN BARRY DRIVE, LLC, ) ) ) ) ) | |
| Plaintiffs, ) ) | |
| v. ) ) | ORDER |
| LIDL STIFTUNG & CO. KG, LIDL US, LLC, LIDL US OPERATIONS, LLC, and LIDL US MANAGEMENT, LLC, ) ) ) ) ) | |
| Defendants. ) | |

This matter is before the Court on defendants' motions to dismiss. [DE 18, 31]. Both have been fully briefed and are ripe for disposition. A hearing was held before the undersigned on December 20, 2018 in Elizabeth City, North Carolina. [DE 40]. For the following reasons, defendants' motions to dismiss [DE 18, 31] are GRANTED and plaintiffs' complaint is DISMISSED. Further, defendants' motion to dismiss which precedes plaintiffs' amended complaint [DE 15] is DENIED AS MOOT.

## BACKGROUND

This case arises out of three commercial real estate purchase agreements. The defendants are a German supermarket company, Lidl Stiftung, and three of its U.S. subsidiaries: Lidl US, Lidl US Operations, and Lidl US Management. The plaintiffs are Leon Capital Group and three affiliated entities, collectively "Leon Capital."

In 2014, Lidl Stiftung approached Leon Capital about developing parcels of land in North Carolina that would be anchored by Lidl grocery stores, as part of the German company's North American expansion plan. [DE 17, ¶ 31]. In 2015 and 2016, Leon Capital executed three Purchase

Agreements ("PSAs") with Lidl Stiftung's U.S. subsidiaries for parcels of land in Cary, Wilmington, and Charlotte. *Id.* ¶¶ 50, 96, 152. The parties then began negotiating separate Site Development Agreements ("SDAs") which would specify the site development plans at each of the three locations, including the work that Leon Capital would perform at each. *Id.* ¶ 39(c). But, according to the terms of the PSAs, defendant Lidl US Operations would only enter an SDA for each site contingent upon its final purchase of the land at closing. [DE 18-1, ¶ 20; 18-2, ¶ 20; 18-3, ¶ 20].

Leon Capital alleges that defendants caused delays and difficulties in the development of each site, pushing back the closing dates for the PSAs. Leon Capital further alleges that defendants then terminated the three PSAs in late 2017 and early 2018 after it had already invested considerable time and resources into each site. In June 2018, Leon Capital brought the instant suit, stating claims for specific performance, breach of contract, breach of the covenant of good faith and fair dealing, negligent misrepresentation, actual fraud, violations of North Carolina's Unfair and Deceptive Trade Practices Act, tortious interference with prospective economic advantage, breach of the duty to continue negotiating in good faith, unjust enrichment, and civil conspiracy. [DE 17, ¶¶ 177–261]. Following the U.S. subsidiaries' motion to dismiss [DE 15], plaintiffs amended their complaint. [DE 17].

The U.S. subsidiaries—Lidl US, Lidl US Operations, and Lidl US Management—again moved to dismiss, principally arguing that the parties contracted for a liquidated damages remedy. [DE 18]. Each PSA contains an identical section describing the parties' available remedies in the event of default. Of particular relevance, the PSAs provide that the "sole and exclusive" remedy in the event of defendants' default is delivery of "the Earnest Money actually paid to Escrow Holder prior to the default," to constitute "full, complete and final liquidated damages." [DE 18-

1, ¶ 16(b); 18-2, ¶ 16(b); 18-3, ¶ 16(b)]. The U.S. subsidiaries argue that this case is a simple contract dispute and the parties have already negotiated a remedy.

The German parent company, Lidl Stiftung, has also moved to dismiss. [DE 31]. Lidl Stiftung argues first that it did not enter into any contracts with any of the plaintiffs and that there is no reason to pierce the corporate veil and, second, that plaintiffs' claims fail against it for the same reasons they fail against the U.S. subsidiaries: the liquidated damages provision.

Plaintiffs oppose both motions on various grounds. After both motions had been fully briefed, a hearing was held in Elizabeth City, North Carolina on December 20, 2018 before the undersigned. [DE 40].

## DISCUSSION

All of the remaining defendants have moved to dismiss plaintiffs' complaint under Federal Rule of Procedure 12(b)(6), arguing that the complaint fails to state a claim upon which relief can be granted. The first motion was made by Lidl's U.S. subsidiaries, the second by German parent company Lidl Stiftung. Although the two motions raise some distinct arguments, the Court will consider them together, as both ultimately prevail for the same reason.

When considering a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), "the court should accept as true all well-pleaded allegations and should view the complaint in a light most favorable to the plaintiff." *Mylan Labs., Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir. 1993). A complaint must state a claim for relief that is facially plausible. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Facial plausibility means that the court can "draw the reasonable inference that the defendant is liable for the misconduct alleged," as merely reciting the elements of a cause of action with the support of conclusory statements does not suffice. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The court need not accept the plaintiff's legal conclusions drawn from

the facts, nor need it accept unwarranted inferences, unreasonable conclusions, or arguments. *Philips v. Pitt County Mem. Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009). When a complaint refers to, but does not attach, documents—here, the Cary, Wilmington, and Charlotte PSAs—a court may consider the documents without converting the Rule 12(b)(6) motion into a motion for summary judgment.

Despite numerous parties and numerous claims, this case is fundamentally simple: was the liquidated damages remedy contained in each PSA truly "sole and exclusive"? The Court is persuaded that it was and that, as a result, all of plaintiffs' claims are barred.

Because this case is before the Court on diversity jurisdiction, North Carolina substantive law governs Leon Capital's claims. North Carolina has long enforced liquidated damages provisions. *See, e.g., City of Kinston v. Suddreth*, 266 N.C. 618, 620 (1966). "Ordinarily, when parties are on equal footing, competent to contract, enter into an agreement on a lawful subject, and do so fairly and honorably, the law does not permit inquiry as to whether the contract was good or bad, whether it was wise or foolish." *Roberson v. Williams*, 240 N.C. 696, 701 (1954). "Unless the provision for liquidated damages be regarded as a penalty and unenforceable, the effect of such clause in a contract is to substitute the amount agreed upon as liquidated damages for the actual damages resulting from breach of the contract, and thereby [prevent] a controversy between the parties as to the amount of damages." *Knutton v. Cofield*, 273 N.C. 355, 363 (1968) (internal quotations omitted).

Leon Capital, Lidl Stiftung, and Lidl's U.S. subsidiaries are sophisticated parties. At the hearing, counsel informed the Court that the parties had worked together previously on other site developments. Leon Capital has handled more than three billion dollars in real estate developments and Lidl Stiftung operates thousands of grocery stores worldwide. Both were represented by

4

counsel during the negotiations of the PSAs. There is no allegation that the PSAs were not negotiated in good faith. The relevant section of each PSA is clear, unequivocal, and worth reproducing in full:

> (b) <u>Purchaser's Default</u>. If Purchaser fails or refuses to perform its obligations under this Agreement, and such failure or refusal is not cured within ten (10) Business Days after Purchaser's receipt of notice of such failure from Seller, then Seller may as its *sole and exclusive remedy* have, and Escrow Holder shall deliver to Seller, the Earnest Money actually paid to Escrow Holder prior to the default, *as full, complete and final liquidated damages*, and not as a penalty. Seller and Purchaser hereby agree that it would be difficult, if not impossible, to ascertain the damages accruing to Seller as a result of a default by Purchaser under this Agreement, but that the parties have agreed upon the Earnest Money paid prior to the default as a reasonable estimate thereof. The payment of said liquidated damages, therefore, shall constitute Seller's *sole and exclusive remedy* against Purchaser at law and in equity and shall be *in lieu of the exercise by Seller of any other legal or equitable right or remedy* that Seller may have against Purchaser as a result of Purchaser's default.

[DE 18-1, ¶ 16(b); 18-2, ¶ 16(b); 18-3, ¶ 16(b)] (emphasis added). The contractual language was drafted with a situation just like this one in mind. Paragraph 16(b) of the PSAs *twice* provides that the earnest money deposit is the "sole and exclusive remedy" available to the seller (Leon Capital). That deposit is "full, complete and final liquidated damages," and "shall be in lieu of . . . any other legal or equitable right or remedy." The parties expressly agreed that "it would be difficult, if not impossible, to ascertain the damages" in situations like the one now before the Court.

Leon Capital's attempts to evade Paragraph 16(b) are unavailing. First, Leon Capital argues that the default provision is not applicable to site development work and future agreements. Rather, Leon Capital argues that other contracts were formed, verbally and by email, and that the default provision should not be construed as applying to all of the possible disputes that could arise between the parties before closing. For support, Leon Capital cites the proposed Wilmington SDA, which does not reference the liquidated damages provision of the PSA and instead sets out distinct remedies related to development work at the Wilmington site. But no other binding contract exists.

The Wilmington SDA was never executed (because the parties never closed on the Wilmington PSA) and the other agreements between the parties are not legally enforceable given North Carolina's statute of frauds, N.C. Gen. Stat. § 22-2, which applies to real estate transactions like the one at issue here. Leon Capital also argues that because it would be easy to ascertain how much it spent developing the sites, the requirements for enforcing a liquidated damages provision are not met. While relevant to determining whether a provision amounts to a liquidated damages provision (and not a penalty), the fact that actual damages might end up being easy to determine does nothing to undermine the enforceability of an otherwise valid liquidated damages provision that was negotiated in good faith, like the one at issue here.

Second, Leon Capital argues that the default provision is permissive and that it is entitled to reject the earnest money and instead sue for actual damages. Here, Leon Capital notes that "Seller *may* as its sole and exclusive remedy" obtain delivery of the earnest money deposit, not that it *must*. While it is true that North Carolina law gives ordinary meaning to ordinary words, the Court will not elevate the singular "may" over the otherwise clear and unambiguous language in the default provision limiting Leon Capital to the earnest money deposit in the event of Lidl's breach. "A contract must be construed as a whole, and the intention of the parties is to be collected from the entire instrument and not from detached portions . . . ." *Robbins v. C. W. Myers Trading Post, Inc.*, 253 N.C. 474, 477 (1960). Reading Paragraph 16(b) and the PSA as a whole, it is clear that the parties intended for the default provision to be the sole and exclusive remedy.

Third, Leon Capital argues that the default provision is unenforceable as a penalty. When a liquidated damages provision is unreasonable in relation to the damages caused by the breach, North Carolina will not enforce it. *Knutton*, 273 N.C. at 361. Leon Capital argues that the earnest money deposits—collectively over $350,000—are "wholly disproportionate to the actual

6

damages" that Leon Capital suffered. [DE 20, p. 20]. This is the crux of the dispute: Leon Capital spent money developing the Cary, Wilmington, and Charlotte sites without contractual protection, with only Lidl's word that it would reimburse Leon Capital for the site work, and then Lidl backed out. While this was an unfortunate turn of events for Leon Capital, it is not enough to render the liquidated damages provision and the hundreds of thousands of dollars that Leon Capital is entitled to receive as compensation for Lidl's breach a *penalty on Leon Capital*.

Fourth, Leon Capital argues that the default provision is "inconsistent" with Paragraph 7(d) of each PSA, the indemnity provision. In particular, Leon Capital argues that the inclusion of an industry-standard indemnity provision, intended to protect Leon Capital from losses caused by Lidl's activity on land that, until closing, Leon Capital owned, makes Lidl liable for the cost of any site work that Leon Capital undertook on Lidl's behalf. Not so. As mentioned above, payment for site work would be governed by the SDAs, to be executed upon closing. Lidl defaulted prior to closing. The Court declines Leon Capital's invitation to misconstrue Paragraph 7(d) to either invalidate the default provision or afford Leon Capital repayment for the site work it undertook.

Leon Capital's remaining arguments are similarly unpersuasive. There was no ambiguity in the PSAs, no ambiguity was created by subsequent agreements and conversations between the parties, and the PSAs clearly represent a meeting of the minds. Further, even viewing the complaint in the light most favorable to Leon Capital and drawing all reasonable inferences in its favor, the complaint does not allege sufficient facts for the Court to conclude that a potentially separate, legally binding agreement existed with respect to the Wilmington site work such that the Wilmington PSA was modified and its default provision no longer applicable. The alleged facts do not credibly demonstrate a subsequent agreement that modified or waived the Wilmington PSA or "conduct which naturally and justly lead[] the other party to believe the provisions of the

contract [were] modified or waived." *Hodgson Const., Inc. v. Howard*, 87 N.C. App. 408, 414 (N.C. App. 2007). Rather, the Wilmington PSA remained in place, as did its default provision.

Thus, Paragraph 16(b) of each of the three PSAs provided Leon Capital with an earnest money deposit in the event of Lidl's breach. That is the sole and exclusive remedy available to Leon Capital. Because there is no allegation that Leon Capital has requested delivery of the earnest money and been denied it, no claim for breach of the PSAs has been stated. All of Leon Capital's remaining claims arise from Lidl's termination of the Cary, Wilmington, and Charlotte PSAs. Accordingly, the U.S. subsidiaries' motion to dismiss must be granted, and each of Leon Capital's claims must be dismissed.

For the same reasons that Paragraph 16(b)'s default provision is Leon Capital's sole and exclusive remedy against Lidl's U.S. subsidiaries, it is the sole and exclusive remedy against Lidl Stiftung. There is no need for the Court to consider whether Leon Capital has alleged sufficient facts to state a claim for corporate veil piercing or whether their civil conspiracy claim enables them to evade any of the limitations imposed by Lidl Stiftung's corporate form. Accordingly, Lidl Stiftung's Rule 12(b)(6) motion to dismiss is granted.

CONCLUSION

For the above reasons, defendants' motions to dismiss [DE 18, 31] are GRANTED. Plaintiffs' complaint is DISMISSED. Defendants' motion to dismiss which precedes plaintiffs' amended complaint [DE 15] is DENIED AS MOOT. The Clerk is DIRECTED to close the case.

SO ORDERED, this 6 day of January, 2019.

*Terrence W. Boyle*
TERRENCE W. BOYLE
CHIEF UNITED STATES DISTRICT JUDGE